IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:13-CV-00058-GCM

| | |
|---|---|
| ABIGAIL WILSON, | ) |
| Wilsons, | ) |
| v. | ) ORDER |
| GASTON COUNTY, NC<br>JIM N. PUTMAN III, | ) |
| Defendants. | ) |

**THIS MATTER** is before the Court on Defendant Gaston County's Motion for Summary Judgment (Doc. No. 56), Wilson's Response in Opposition (Doc. No. 60), and Defendant's Reply (Doc. No. 62). For the reasons stated below, the Motion for Summary Judgment is **GRANTED**.

## I. BACKGROUND

Plaintiff Abagail Wilson was hired by Gaston Emergency Medical Services ("GEMS") as a paramedic in April 2009. (Doc. No. 28) She continued to work there until voluntarily leaving her employment in November 2014. (Doc. No. 60 at 18) GEMS is operated by Defendant Gaston County. It is undisputed that GEMS circulated a policy against sexual harassment to its employees. (Doc. No. 60-29) The policy states, in relevant part, that employees are prohibited from engaging in sexual harassment and that the County "will act responsibly to maintain a professional working environment." (*Id.*) An employee who learns of any harassment "should report the alleged act immediately to a member of his or her management team in writing," or, if the employee is uncomfortable speaking to the management team, "to the Human Resources Director." (*Id.*)

### A. Wilson's temporary discharge in 2010

In September 2010, Wilson developed tumors in her breast, and her doctor initially recommended that she undergo surgery to have the tumors removed. (Doc. No. 28 at 5). Wilson requested time off to have the surgery. Tommy Cleary, her supervisor at the time, told her that she was eligible for time off under the Family Medical Leave Act ("FMLA"), even if she did not have enough sick days saved. (Cleary Depo. at 69-70, DE 60-5) He warned her to make sure she submitted all the required paperwork. (*Id.* at 72) However, it ultimately became clear that the tumors were benign and no procedure was necessary. (Wilson Depo. at 71, Doc. No. 57-2)

Sometime before September 2010, Wilson received three speeding tickets while driving her own vehicle and, as a result, was no longer qualified to drive an ambulance per the County's policy. (Doc. No. 28 at 5) On October 12, GEMS terminated her employment, although it noted on her termination form that she could be rehired "after [her] driving record clear[ed]." (Doc. No. 57-4). Other drivers who did not have valid licenses, or who for other reasons were not permitted to drive county vehicles, were not terminated. (Cleary Deposition at 64, Doc. No. 60-5)

Wilson filed a complaint with the United States Department of Labor. (Doc. No. 60-11) The agency determined that GEMS had violated the FMLA by terminating Wilson's employment after she sought medical leave. (*Id.*) As a result, Wilson was reinstated on October 19, 2010 with full back pay. (Wilson Depo. at 158, Doc. No. 60-4)

Wilson claims that, after her reinstatement, she was treated differently than her co-workers and received more written warnings than other employees. However, her own exhibit demonstrates that she was not written up more frequently than her peers. (Doc. No. 60-13)

Wilson received only one written warning in 2010, it occurred before she sought leave for her surgery, and she was not written up again until August 2011. (*Id.*; Doc. No. 57-4 at 5-6)

### B. Sexual harassment

GEMS hired Defendant Jim Putman in December 2010. (Putman Depo at 52, Doc. No. 60-16) Putman told GEMS employees who interviewed him that he had been terminated from his previous position, but he was not asked for any additional details about the incident. (*Id.* at 53)

During Putman's tenure at GEMS, two female employees complained about his behavior. First, a female partner of Putman's complained that he was creating a hostile work environment. (*Id.* at 80-86) Putman was called to meet with Chief Mark Lamphiear, Assistant Chief Jeff Waldrep, and his immediate supervisor, Captain Jamie McConnell. (*Id.* at 80-86) He was ultimately transferred to a different shift. Next, a subsequent female partner of Putman's, Jessica Spurrier, complained to supervisors that Putman repeatedly tried to tickle and poke at her during their one of their shifts despite multiple requests that he stop. (Jessica Spurrier Depo at 16-17, Doc. No. 60-17) The incident ended when Putman came "uncomfortably close" to Spurrier's face. (*Id.* at 16) Spurrier believed that Putman was trying to kiss her, and she punched him in order to fend him off. (*Id.* at 16, 19-21) Spurrier complained to Jamie McConnell and his assistant, Lieutenant Travis Adams. (*Id.* at 16; 24) She told them that she did not want to ride with Putman again, saying, "[H]e got in my personal space, tickling me, that I was uncomfortable, I didn't want to do it again." (*Id.* at 24) Spurrier was not partnered with Putman again. (*Id.* at 16; 24-25) She apparently did not have any further problems with Putman. (Spurrier Declaration at 3, Doc. No. 62-2)

3

Wilson was partnered with Putman on one occasion in October 2011. (Wilson Depo. at 279-80, Doc. No. 60-4) Putman did not engage in any inappropriate conduct and the two became friendly. (*Id.* at 280-81) However, shortly thereafter, in November 2011, Putman began sending Wilson inappropriate text messages. (*Id.* at 284-85, 288, 294) For example, he would send messages "about how pretty he thought [she] was" and "how he had been dying to kiss her." (*Id.* at 288) When Wilson received text messages of this nature, she would typically respond, "Okay," or "Thanks," without any encouragement. (*Id.* at 289) Alternatively, she would remind Putman that they were both married. (*Id.*) He later sent her a picture of his genitals, which she immediately deleted. (*Id.* at 289, 291) Wilson did not respond to messages from Putman containing sexual content. (*Id.* at 294) At some point in late November or early December, Wilson "casually" mentioned to Travis Adams that Putman was bothering her. (*Id.* at 123). She told him that Putman was "not leaving as soon as he was cleared to," and that he was waiting to talk to her.[1] (*Id.* at 123). At some point in November or December, she also informed Adams that Putman was frequently messaging her. (*Id.* at 122-25)

In early December 2011, Putman's behavior worsened. (*Id.* at 60) During a shift, Putman pulled Wilson out of an ambulance, bruising the underside of her knee in the process. (*Id.* at 295, 300) He forced her to stand against the truck, and groped her breasts and pelvic area. (*Id.* at 300) Putman released Wilson after a co-worker, Jason Spurrier, approached the ambulance. (*Id.*) Spurrier recalled that he had seen Putman touching Wilson, and that Wilson became more and more upset, repeatedly telling Putman "Stop." (Jason Spurrier Depo. at 19-20, Doc. No. 60-22) After the incident, Putman engaged in increasing unwanted physical contact

---

[1] Adams denies this and claims he first learned that Wilson had complained about Putman from Chief Lamphiear sometime after Human Resources investigated Putman's conduct in March 2012. (Adams Depo., Doc. No. 57-11)

4

and would regularly poke at Wilson, pull on her hair, and try to tickle her. (Wilson Depo. at 297-99, Doc. No. 60-4) In Wilson's words, "it was things you see second graders doing . . . [i]t was just childish messings [sic] all the time." (*Id.* at 299) Wilson told Jamie McConnell about the assault, but "did not go into much detail. (*Id.* at 125; Doc. No. 60-31 at 4-5) She told him that Putman had given her a bruise and that she did not want to be partnered with him. (Wilson Depo. at 125, Doc. No. 60-4; Doc. No. 60-31 at 4-5).[2]

In January 2012, Putman hit Wilson's buttocks in front of several co-workers, one of whom, Tina Behler, confirmed that she saw the incident. (*Id.* at 303, 305; Tina Behler Depo., Doc. No. 60-23) The force knocked Wilson's glasses off, sent her clipboard flying, and left her with a bruise. (Wilson Depo. at 302-03, Doc) Wilson told Putman to stop touching her, and Behler also "told him it was unnecessary." (*Id.*) Wilson also began complaining more about Putman's behavior to Travis Adams, around this time. (*Id.* at 309) Wilson told Adams that it was "getting to the point of being aggravating" and said "you all need to do something." (*Id.* at 127) She told him that Putman was still messaging her, that her husband was upset, and that "now he [was] sending [her] home with bruises." (*Id.* at 309) Adams told Wilson that he would "handle it." (*Id.* at 122) When she asked whether she needed to alert Chief Lamphiear, Adams repeated that he would take care of it. (*Id.*) During the same month, Putman sent Wilson a second picture of his genitals. (*Id.* at 304) This time, Wilson showed the picture to her partner, Phil Parker. (*Id.* at 307) Wilson and Parker both approached Travis Adams and complained about the picture.[3] (*Id.* at 310) Wilson also alleges that at a shift meeting, both Adams and

---

[2] McConnell denies this. He says that he first learned that Wilson was experiencing difficulty with Putman in March 2012. (McConnell Depo at 42-43, Doc. No. 57-10)

[3] Parker does not recall reporting Putman's conduct to anyone else with Wilson or on her behalf. (Parker Depo. at 53-54, Doc. No. 60-20)

McConnell observed Putman pulling her hair and otherwise "mess[ing] with" her and failed to reprimand him or otherwise act. (*Id.* at 214-15)

In March 2012, Parker and Putman had an altercation that brought the situation to the attention of upper level GEMS management. (*Id.* at 313; Parker Depo. at 20, Doc. No. 60-20) Parker witnessed Putman poking at Wilson, and Wilson later showed Parker text messages in which Putman asked "Why aren't you talking to me?" (Parker Depo at 15-17, Doc No. 60-20) Though Parker initially advised Wilson to ignore Putman, he later grew angry when he saw Putman blocking Wilson from leaving a supply closet and grabbing her arm. (*Id.* at 19-20) Parker grabbed Putman and pushed him against the wall, warning him to "leave her alone." (*Id.* at 20) Jamie McConnell heard the noise and called Putman, followed by Parker, into his office. (*Id.* at 21)

Human Resources conducted an investigation into Putman's behavior after the incident between Putman and Parker, interviewing several GEMS employees (Massey Depo. at 29, Doc. No. 60-24) and reviewing Wilson's hand written description of Putman's behavior. (Doc. No. 60-31) Human Resources Coordinator Amia Massey reported based on these interviews that Wilson's allegations had been substantiated. (Doc. No. 35) Massey concluded that Putman had violated Gaston County's policy against sexual harassment and recommended corrective action. (*Id.*) GEMS opted to take several measures against Putman, including a written warning, shift change, counseling requirement, and suspension. (Massey Depo at 47, Doc. No. 57-7)

After Putman's suspension, he interacted with Wilson several times because, when their schedules overlapped, they would pass each other while changing trucks during a shift. (Wilson Depo. at 188-90, Doc. No. 60-4) On one such occasion, Putman called Wilson "a bitch" and blamed her for causing problems with his wife. (*Id.* at 196) He also threw his keys at her two

6

different times. (*Id.*) Finally, Putman bumped into her shoulder in passing, although it is unclear from the record how many times this occurred. (*Id.* at 327-28) Their interactions ended when Chief Mark Lamphiear learned that the two were forced to see each other during these exchanges. (Doc. No. 35) Lamphiear ordered that Putman's shifts be changed. (*Id.*)

### C. Subsequent events

Sometime after Putman's sexual harassment, Wilson sought a promotion at GEMS and was unsuccessful. (Wilson Depo. at 200, Doc. No. 60-4) Wilson sought to become a Field Training Officer ("FTO") and train new employees. (*Id.*) To be eligible to become an FTO, an employee needed to have three years of employment at GEMS, including at least two years as a paramedic. (*Id.*) At the time that Wilson attempted to become an FTO, she was one of three members of her shift that met the requirements. (*Id.*) None of the three were selected, however, and GEMS chose two employees with less than two years of experience at the department and only one year of paramedic work. (*Id.*) GEMS then changed the qualifications necessary to become an FTO, adopting written standards and considering factors such as "patient care issues" and "driving issues." (*Id.* at 201)

Wilson also explained that she felt as though upper level GEMS personnel "pushed [her] supervisors to write [her] up" more frequently. (*Id.* at 214) After Wilson reported Putman's conduct, she received two written warnings in 2012, and three written warnings each subsequent year. (Doc. No. 60-13) In particular, Wilson received a written warning for appearing in uniform on social media, despite the fact that many employees had done so without consequence. (Wilson Depo. at 287-89, Doc. No. 60-4) Additionally, Wilson received a written warning for "third party sexual harassment" after a co-worker hugged her in the aftermath of a "bad call."

7

(*Id.* at 161-62) Wilson was written up approximately six months after the hug while Massey was interviewing GEMS employees about the co-worker's conduct.[4] (*Id.* at 161-62)

### D. Procedural history

Wilson filed a charge with the Equal Employment Opportunity Commission on December 21, 2012, alleging discrimination based on sex and disability, as well as retaliation on both grounds, by Gaston County. (Doc. No. 1-5) On January 9, 2013, Wilson filed a lawsuit in Gaston County Superior Court against both the County and Putman. (Doc. No. 1-3; Doc. No. 1-7) The complaint alleged claims for: (1) battery; (2) intentional infliction of emotional distress; (3) negligent infliction of emotional distress; (4) negligent supervision and retention; and (5) violations of the Family Medical Leave Act. (*Id.*)

The County removed the case to this Court on January 29, 2013. (Doc. No. 1) Defendant Putman moved to dismiss Plaintiff's claim for negligent infliction of emotional distress on March 6, 2013. (Doc. No. 8) The County moved to dismiss the negligent infliction of emotional distress claim, as well as the negligent supervision and retention claim on March 26, 2013. (Doc. No. 13) The Court granted the motion as to the negligent infliction of emotional distress, but denied the motion as to negligent supervision. (Doc. No. 19) Wilson then filed an amended complaint on January 29, 2014, which Defendants answered on February 10 and 11. (Doc. No. 29, 30) The amended complaint alleges claims for: (1) battery; (2) intentional infliction of emotional distress; (3) negligent supervision and retention; (4) violations of the Family Medical Leave Act; (5) creation of a hostile work environment and retaliation in violation of Title VII; and (6) discrimination and retaliation in violation of the Americans with

---

[4] Massey disputes Wilson's characterization of these events. By her account, another GEMS employee filed a complaint about Wilson. According to the employee, Wilson was sitting on someone's lap in a recliner in a manner that made the employee uncomfortable. The employee purportedly expressed concern because a youth "Explorer scout" was in the room at the time. (Massey Depo. at 55-58; Doc. No. 62-4)

8

Disabilities Act ("ADA"). (Doc. No. 28) The County moved for summary judgment on March 31, 2014. (Doc. No. 57)

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The mere existence of a scintilla of evidence" in support of the non-movant's position is not sufficient to establish a genuine dispute. *Id.* at 252. A material fact affects the outcome of the suit under the applicable substantive law. *See id.* at 248. When determining whether a dispute is genuine or a fact is material, courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Unsupported speculation, however, is insufficient to defeat a motion for summary judgment. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996).

## III. DISCUSSION

### A. Battery

A plaintiff makes out a claim for battery if she establishes a harmful or offensive contact with her person and an absence of privilege. *Hawkins v. Hawkins*, 400 S.E.2d 472, 475 (1991), *aff'd*, 331 N.C. 743, 417 S.E.2d 447 (N.C. Ct. App. 1992). An employer may be liable for a battery committed by its employee if it authorized the tortious behavior, if the act occurred while the employee was acting within the scope of his employment, or if the employer ratified the conduct after the fact. *Brown v. Burlington Indus., Inc.*, 378 S.E.2d 232, 235 (N.C. Ct. App.

1989). Intentional torts generally are not considered to be within the scope of employment. *Id.* at 436-37. An employer can be said to have ratified tortious conduct only if it "had knowledge of all material facts" and showed an intention to ratify the act by words or conduct. *Id.* at 437. An employer can ratify an employee's conduct by failing to act to correct it. *See id.*

Here, Plaintiff has failed to establish that Gaston County had knowledge of all of the material facts surrounding a battery that Putman committed at any time before March 2012—at which point it took immediate corrective action. Although Wilson argues that "[s]he specifically described" Putman's December 2011 assault to McConnell (Plaintiff's Response in Opposition at 10, Doc. No. 60), the record does not support this inference. Wilson says that she told McConnell that Putman "left a bruise on her." (Wilson Depo. at 124, 125, Doc. No. 60-4). She conceded that she did not describe the incident as sexual harassment. (*Id.* at 125) Moreover, in the account that she gave Human Resources during its investigation, Wilson said that she told McConnell about the bruise but "did not give much detail." (Doc. No. 60-31 at 4-5) In that account, Wilson stated that she told McConnell she did not want to "get on a truck with Jim" again, a request which her supervisors apparently honored. (Doc. No. 60-31 at 4-5)

As for the second instance, in which Putman slapped her buttocks, there is no evidence in the record that Wilson shared all of the material facts and circumstances surrounding that assault with any supervisor. Although she told Adams that Putman was "sending [her] home with bruises," this is not enough information to convey to Adams the circumstances surrounding the slap, or its extremely offensive character. In Wilson's own words, she described Putman's conduct as childish or "aggravating," and Adams would have had no reason to infer that Putman had done something so offensive from her characterization. Thus, GEMS cannot be said to have ratified Putman's conduct.

10

Finally, Wilson argues that Adams and McConnell saw Putman "mess with" her, and that she explicitly complained to Adams about similar conduct, but that neither acted to address the problem. (Plaintiff's Response in Opposition, Doc. No. 60 at 10-11) However, even if this conduct would be sufficient to constitute battery under North Carolina law, Wilson has not established that she provided either Adams or McConnell with all of the material facts surrounding Putman's behavior, such as the frequency with which it occurred, her attempts to stop him, and that she wanted additional recourse beyond not being assigned Putman as a partner. Rather, in Wilson's own words, she told Adams that Putman was text messaging her, waiting around for her after her shift, and that he had given her bruises. She told McConnell that he had given her a bruise. She told both Adams and McConnell that her husband was upset. These complaints did not put Adams and McConnell on notice that Putman had engaged in battery. Additionally, Wilson has not shown that either Adams or McConnell ratified the conduct. Wilson asked not to be put on the same truck as Putman, and this request was honored. Because Adams and McConnell took the action that Wilson requested, she cannot claim that their failure to act ratified Putman's conduct.

**B. Intentional infliction of emotional distress**

To establish that she was subjected to intentional infliction of emotional distress, a plaintiff must demonstrate that the defendant engaged in extreme and outrageous conduct that was intended to cause, and did cause, severe emotional distress. *Dickens v. Puryear*, 453, 276 S.E.2d 325, 335 (N.C. 1981). Conduct is extreme and outrageous when it goes beyond all possible bounds of decency and would be considered "atrocious" and "utterly intolerable" in civilized society. *Smith-Price v. Charter Behavioral Health Sys.*, 595 S.E.2d 778, 782 (N.C. Ct. App. 2004). Whether conduct is extreme and outrageous is a question of law for the court to

decide, although whether the conduct warrants liability is a question for the jury. *Id.* An employer is liable for intentional infliction of emotional distress caused by its employee if it sanctioned the conduct, ratified it afterward, or if the act was committed in the scope of the person's employment. *Brown*, 378 S.E.2d at 436.

Wilson's claim for intentional infliction of emotional distress relies primarily on the same conduct by Putman that underlies her battery claim. As explained in the preceding section, Gaston County did not have knowledge of all of the material facts and circumstances surrounding Putman's behavior, and thus cannot be said to have ratified his conduct. Wilson also alleges, however, that Putman sent her sexual text messages, including two pictures of his genitals—one of which she reported directly to Adams. Again, however, absent a more thorough description to supervisors about Putman's conduct, Wilson cannot demonstrate on this record that GEMS had knowledge of all the material facts and circumstances. Even if Wilson told Adams that Putman had sent her a picture of his genitals, reported that he was "messing" with her, and asked not to be partnered with him, this information does not sufficiently convey to GEMS that Wilson was experiencing extreme emotional distress. Her characterization of Putman's behavior as childish and "aggravating" suggests that GEMS did not have reason to believe she found it to be "atrocious" and untolerable in civilized society. *See Smith-Price*, 595 S.E.2d at 782. For these reasons, even if Putman intentionally inflicted emotional distress on Wilson, that conduct is not attributable to the County.

### C. Negligent supervision and retention

An employer is liable for negligent supervision and retention of an employee if it knew or had reason to know that the employee was incompetent, and that incompetency proximately caused the employee to tortuously injure the plaintiff. *Hogan v. Forsyth Country Club Co.*, 340

12

S.E.2d 116, 123 (N.C. Ct. App. 1986). An employee may be incompetent because of an inherent unfitness for the employment, or he may have committed prior similar acts that, if known to the employer, should have disqualified him from the position. *See Medlin v. Bass*, 398 S.E.2d 460, 462 (N.C. 1990).

Wilson has provided factual support for her argument that Putman engaged in sexual harassment on one prior occasion when he attempted to kiss Jessica Spurrier against her will. At that time, Spurrier told Adams and McConnell that Putman had invaded her personal space and that she did not want to be partnered with him again. They complied with her request, and she did not have further issues with Putman. This isolated incident, which by Spurrier's account to supervisors was relatively minor and quickly resolved, was significantly different than Wilson's allegations, which involve sustained attempts at physical contact, repeated sexual text messages, and two physical assaults. Because the prior incident was of a different and substantially less serious nature, it was insufficient to put GEMS on notice that Putman may be unfit for employment and thus cannot support a claim of negligent supervision and retention.

### D. Violations of the Family Medical Leave Act

The FMLA requires, in relevant part, that employers provide a total of 12 weeks of unpaid leave per year to employees who are unable to perform their job functions due to a serious health condition. 29 U.S.C. § 2612(a)(1)(D); *id.* § 2612(c). Its enforcement provision allows an employee whose employer has failed to comply with the statute to bring a private cause of action for damages in the amount of "any wages, salary, employment benefits or other compensation denied or lost" as a result of the violations. 29 U.S.C. § 2617(a)(1)(A)(i); *id.* § 2617(a)(2). In the event that the violations did not cause the employee to lose compensation, the statute also allows for damages equal to "any actual monetary loss sustained by the employee as

13

a direct result of the violation." *Id.* § 2617(a)(1)(A)(ii); § 2617(a)(2). An employee may also sue for appropriate equitable relief such as employment, reinstatement, or promotion. *Id.* § 2617(a)(1)(B). To ultimately prevail on a claim that an employer violated the FMLA, the plaintiff must show (1) she was entitled to FMLA leave, (2) her employer interfered with her use of that leave, and (3) the employer's action caused her harm. *Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 427 (4th Cir. 2015). If the plaintiff claims retaliation under the FMLA, she must establish that (1) she engaged in protected conduct, (2) her employer took an adverse employment action against her, and (3) the employer's action caused her harm. *Id.* at 429.

To begin with, Wilson lacks statutory standing to sue under the FMLA because Congress's "legislatively conferred cause of action" does not encompass her particular claim. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014). The FMLA provides plaintiffs with an avenue to recover "wages, salary, employment benefits or other compensation denied or lost" or "actual monetary loss sustained" as a result of the violations. 29 U.S.C. § 2617(a)(1)(A); *id.* § 2617(a)(2). Wilson suffered no monetary loss attributable to her brief termination because she was restored after one week and awarded full back pay. Thus, her claim is not within the ambit of the FMLA's enforcement provision.

Wilson's claim fails on the merits for similar reasons. Wilson cannot make out the elements of an FMLA claim because she has not demonstrated that she suffered harm. Although she was briefly discharged, she was reinstated one week later, and suffered no monetary loss. She does not provide evidence of any additional harm or incurred expenses resulting from her

14

brief termination, and thus has failed to establish that any violation of the FMLA by GEMS caused her harm.[5]

Wilson also argues that GEMS retaliated against her for asserting her rights under the FMLA because she received written warnings more frequently than co-workers after she returned. However, she not established that she suffered an adverse employment action after being reinstated by GEMS. First, the record clearly demonstrates that Wilson's supervisors did not issue more warnings to her after she requested leave to have surgery. She requested time off in September 2010 and did not receive a written warning until August of the following year. Second, an increase in written warnings is insufficient to rise to the level of retaliation under these circumstances. Wilson does not contest that she engaged in the prohibited conduct that was the subject of the warnings, and the courts have made clear that "dislike of or disagreement with an employer's decisions does not invariably make those decisions ones that adversely affected some aspect of employment." *Adams*, 789 F.3d at 431. Indeed, "reprimands and poor performance evaluations occur with some frequency in the workplace" and "are much less likely to [constitute] adverse employment actions" than more serious employer conduct. *Id.* Moreover, Wilson continued to work at GEMS for several years after the incident and never complained about discrimination on the basis of requesting FMLA leave, suggesting that her employment conditions were not materially affected. For these reasons, Wilson has not stated a claim under the FMLA.

---

[5] Wilson has provided a report by Dr. Faye E. Sultan, a clinical psychologist, which details the psychological harm that Wilson has suffered in the aftermath of Putman's harassment. (Doc. No. 60-40) The report does not purport to attribute any of these emotional damages to Wilson's one week termination in 2010.

**E. Creation of a hostile work environment and retaliation in violation of Title VII**

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of" her sex. 42 U.S.C. § 2000e–2(a)(1). To make out a claim for sexual harassment, or hostile work environment, under Title VII, the plaintiff must establish that (1) the defendant engaged in unwelcome conduct, (2) because of her sex, (3) the conduct was sufficiently severe or pervasive that it altered the conditions of her employment, and (4) the conduct is attributable to the employer. *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003). Where a plaintiff has been harassed by a co-worker, the employer may be liable "if it knew or should have known about the harassment and failed to take effective action to stop it." *Id.* at 333-34. If the employer failed to adopt and promote reasonable procedures that victims could use to register complaints, it can be held liable under a theory of constructive knowledge. *Id.* at 334. When an employer circulates a reasonable policy against sexual harassment, this "provides compelling proof that the company exercised reasonable care in preventing and promptly correcting sexual harassment." *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 266 (4th Cir. 2001) (internal quotation marks and citation omitted). The plaintiff can rebut this proof by showing that "the employer adopted or administered an anti-harassment policy in bad faith or that the policy was otherwise defective or dysfunctional." *Id.*

Title VII also contains a provision that prohibits retaliation, defined as discrimination against an employee because she "has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e–3(a). A plaintiff can state a claim for retaliation under Title VII by demonstrating "(1) that she engaged in a protected

activity; (2) that her employer took an adverse employment action against her; and (3) that there was a causal link between the two events." *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 410 (4th Cir. 2013). The plaintiff's participation in a protected activity must be the but-for cause of the adverse employment action, *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013), and the plaintiff must prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer," *id.* at 2533. "The requirement of an adverse employment action seeks to differentiate those harms that work a 'significant' detriment on employees from those that are relatively insubstantial or 'trivial.'" *Adams*, 789 F.3d at 431 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

Wilson's claim that Gaston County is responsible for Putman's harassment is unsuccessful. GEMS promoted a reasonable harassment policy that provides "compelling proof" that it worked to prevent and promptly remedy sexual harassment. *Barrett*, 240 F.3d at 266. Wilson did not avail herself of the policy's remedial mechanism by submitting a written account of Putman's harassment until March 2012. At that time, Human Resources conducted an investigation and GEMS took action against Putman after it found her allegations to be substantiated. Additionally, Putman was transferred from his shift, first so that he would never work at the same place as Wilson, and then again so that they would never pass each other during a shift change. Because Wilson ultimately used the policies set forth in the policy against harassment, and as a result management made sure that any possibility of contact with Putman was removed, Wilson had not provided facts that could support an inference that GEMS circulated a dysfunctional or defective policy. Because GEMS did not act unreasonably, Wilson has failed to make out the elements of a claim for hostile work environment under Title VII.

Wilson's claim that GEMS retaliated against her—by issuing written warnings against her and failing to promote her—is also unavailing. First, even if Wilson's allegations are true, and between two and three times per year her supervisors gave her written warnings for engaging in conduct that was prohibited, but often tolerated, these actions are insufficient to rise to the level of retaliation under Title VII. Employer action is significant enough to constitute an adverse employment action if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 68. "[P]etty slights . . . will not create such a deterrence." *Id.* Wilson's receipt of two or three written warnings per year are the type of minor slights that do not constitute adverse employment actions under Title VII because they were not so serious that they would deter a reasonable employee in her situation from reporting discrimination.

Second, although Wilson alleges that GEMS refused to promote her to Field Training Officer as a result of her complaints about Putman's discrimination, she has failed to provide sufficient facts to support an inference that her complaints were the but-for cause of GEMS decision not to promote her. *Nassar*, 133 S. Ct. at 2528. Wilson alleges that at the time she hoped to be promoted, she was one of three employees from her shift that met the existing qualifications for the position. (Wilson Depo. at 200-01, Doc. No. 60-4) Wilson also says, however, that none of the three qualified employees were promoted, and that GEMS instead opted to promote two other employees and change the eligibility rules. (*Id.* at 200-01) Because GEMS passed over two other employees who were similarly situated for the promotion and changed its eligibility criteria, Wilson cannot establish that she would have been promoted absent wrongful conduct by the organization. Indeed, Wilson does not attempt to argue that she would have been promoted under the more nuanced criteria but-for her allegations against

Putman. Accordingly, Wilson has not stated a claim for discrimination or retaliation under Title VII.

**F. Violations of the Americans with Disabilities Act**

The Americans with Disabilities Act provides that "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112. A plaintiff seeking recovery for discrimination under the ADA must show that she (1) is a member of the protected class, (2) who suffered an adverse employment action, (3) during a time in which she was performing in accordance with her employer's expectations, and (4) the adverse employment action occurred under circumstances that could give rise to an inference of discrimination on the basis of the plaintiff's membership in the protected class. *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001). A plaintiff is a member of the class protected by the ADA if she suffers from "a physical or mental impairment that substantially limits one or more major life activities," or if others regard her as having such an impairment. 42 U.S.C. § 12102(1). A plaintiff claiming unlawful retaliation under the ADA must meet a similar, though slightly different, standard. *Adams*, 789 F.3d at 430. She must show that (1) she engaged in protected conduct under the ADA, such as filing a charge, participating in an investigation, or protesting unlawful discrimination; (2) she suffered an adverse employment action; and (3) there was a causal link between the two actions. *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 350 (4th Cir. 2011).

To the extent Wilson argues that her brief termination by GEMS in 2010, followed by reinstatement with full backpay, constituted discrimination or retaliation in violation of the ADA,

this claim fails. Wilson cannot show that she was performing her job in accordance with her employer's expectations, because she had received three moving violations and was thus no longer qualified to drive an ambulance—one of the core functions of her position. Accordingly, she has not made out a prima facie case of discrimination on the basis of a disability or perceived disability. Wilson's allegations that she received more frequent written warnings are unavailing for same reasons that they failed to rise to the level of retaliation under the FMLA and Title VII. In short, "[e]ven assuming the unlikely presence of an unlawful discriminatory intent" for the written warnings Wilson received, "they did not cross the threshold that courts have traditionally required for a personnel matter to be actionable." *See Adams*, 789 F.3d at 431.

## IV.   ORDER

**IT IS THEREFORE ORDERED** that Defendant Gaston County's Motion for Summary Judgment is **GRANTED**.

**SO ORDERED**.

Signed: November 6, 2015

Graham C. Mullen
United States District Judge